**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| **ASHLEY SPARKS**, *et al.*, | ) |
| | ) |
|     **Plaintiffs,** | ) |
| | ) |
| **v.** | )   **CIVIL ACTION 07-0477-WS-C** |
| | ) |
| **PHILLIPS & COHEN ASSOCIATES, LTD.,** | ) |
| | ) |
|     **Defendant.** | ) |

**ORDER**

    This matter comes before the Court on Defendant's Motion for Summary Judgment to Dismiss Plaintiff Ashley Sparks' Claims (doc. 20), Defendant's Motion for Summary Judgment to Dismiss Madora Peoples' Claims (doc. 22), and Defendant's Motion for Summary Judgment to Dismiss Kyra Sparks' Claims (doc. 24). All three Motions have been exhaustively briefed and are now ripe for disposition.

**I.    Background.**[1]

    Notwithstanding the parties' submission of 99 pages of summary judgment briefing (excluding the 86 pages that were stricken as redundant), their piling on of layers of overlapping claims and repetitive arguments, their digressions into tangentially relevant matters, their obfuscation of stronger arguments amidst a sea of weaker ones, and the approximately 600 pages of exhibits they have dumped into the record, this is a very straightforward case, or at least it should be.[2]

---

[1]    The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007). Thus, plaintiffs' evidence is taken as true and all justifiable inferences are drawn in their favor.

[2]    The Court's review of the record has been complicated by two factors. First, plaintiffs have failed to comply with the requirement in the Rule 16(b) Scheduling Order (doc. 11) that "[i]f a party's exhibits in support of or in opposition to a motion exceed 50 pages in the aggregate, then that party must deliver a courtesy hard copy of those exhibits to Judge Steele's Chambers by mail or hand delivery." (Doc. 11, ¶ 13(c).) Second, and more importantly, both parties have submitted voluminous record materials which they do not cite in their briefs. In

Defendant Phillips & Cohen Asociates, Ltd. ("Phillips & Cohen") is a New Jersey-based company in the debt collection business.  When Phillips & Cohen's client (*i.e.*, the creditor) sends it a file on a deceased debtor, Phillips & Cohen refers the file to its probate division, consisting of employees who are specially trained to handle debt collection issues in circumstances where the debtor is deceased.  (Obringer Dep., at 27-28; Strine Dep., at 16-17.) The objective of the probate division is "to find the estate and make a claim against the estate." (Obringer Dep., at 50.)

In November and December 2006, three creditors (Chase Bank USA, Collect America, and Portfolio Recovery Associates, LLC, none of which are parties herein) retained Phillips & Cohen concerning certain credit card debts owed by a Daisy Glover of Selma, Alabama. (Obringer Dep., at Exhs. 1-3.)[3]  Glover had passed away in September 2006.  (Peoples Dep., at 76.)  These three accounts were assigned to Patricia Strine, a collection specialist in Phillips & Cohen's probate division who worked exclusively on estate matters.  (Strine Dep., at 15-16, 23-24; Obringer Dep., at 40.)  Strine's actions with respect to the Glover accounts, and in particular

_____

addition to running afoul of Local Rule 5.5(c)'s requirement that only relevant excerpts of discovery materials be submitted, this practice is not a permissible means of shifting the parties' burdens to the Court.  "There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).  Thus, this Court will not scour uncited portions of the parties' evidentiary submissions for any scrap of evidence that may advance their positions.  *See Preis v. Lexington Ins. Co.*, 508 F. Supp.2d 1061, 1068 (S.D. Ala. 2007) ("Parties may not, by the simple expedient of dumping a mass of evidentiary material into the record, shift to the Court the burden of identifying evidence supporting their respective positions."); *Witbeck v. Embry Riddle Aeronautical University, Inc.*, 219 F.R.D. 540, 547 (M.D. Fla. 2004) ("That judges have no duty to scour the file in search of evidence is an obvious corollary to the requirement that parties specifically identify the portions of the case file which support their assertions regarding whether genuine issues remain for trial."); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) (federal courts "are wary of becoming advocates who comb the record of previously available evidence and make a party's case for it"). Instead, review of the parties' submissions is restricted to the portions of the record they have cited, and the legal arguments they have expressly articulated.

[3]      Phillips & Cohen records reflect that Glover was indebted to Collect America in the amount of $4,307.00; to Portfolio Recovery in the amount of $1,318.98; and to Chase Bank in the amount of $1,967.49.  (*Id.*)  Thus, the total debt that these three clients retained defendant to collect from Glover's estate totaled $7,593.47.

her dealings with the three plaintiffs in this case, lie at the heart of this dispute.

The specific details of what Strine did are a matter of some disagreement between the parties, mostly concerning collateral details that are immaterial to the Motions for Summary Judgment.  In the light most favorable to plaintiffs, however, the record reflects that Strine made inquiries concerning who was handling Glover's final affairs and whether there was a representative of the estate.  (Obringer Dep., at 51-52; Strine Dep., at 23-24, 31.)  Such inquiries led Strine to plaintiff Madora Peoples, who is Glover's daughter.  (Peoples Dep., at 17.)  Peoples was, in fact, handling Glover's affairs during the time period in question, although she was not named as the estate's executrix in Glover's will.  (*Id.* at 77, 97-99.)  A family member who answered the telephone at Glover's former residence advised Strine that Peoples was the point of contact for matters relating to Glover's affairs.  That same family member informed Strine that Peoples could be reached at the office of attorney Kyra Sparks, who is also a plaintiff in this action.  (Strine Dep., at 33-34.)[4]

Peoples has been employed by Sparks as a secretary since September 2006, less than three months before the events giving rise to this lawsuit.  (Peoples Dep., at 27.)  In the light most favorable to plaintiffs, the evidence is that Peoples received a single telephone call from Strine during business hours at Sparks' office on or about November 30, 2006.  (*Id.* at 56.)  According to Peoples, Strine indicated that she was calling pertaining to a debt owed by Glover,

---

[4]      Strine testified that she had no independent recollection of these events, given that she makes more than 30,000 telephone calls per year performing her duties for Phillips & Cohen. (Strine Dep., at 11.)  For that reason, Strine's testimony consisted largely of her interpretation of her contemporaneous notes taken in connection with her efforts to secure payment on the Glover accounts.  Plaintiffs object generally to this evidence and any other evidence drawn from Strine's notes, on the grounds that certain of her notations are inaccurate or incomplete.  These notes may be compelling evidence at trial, but will not be credited on summary judgment to the extent that they conflict with plaintiffs' evidence.  Be that as it may, plaintiffs have identified no evidentiary basis to question the manner in which Strine came to contact Peoples at Sparks' office, so Strine's explanation will be accepted for summary judgment purposes.  If anything, plaintiffs' evidence corroborates Strine's account on this point, inasmuch as Peoples testified that her nephew gave her name and contact information at work to defendant's representatives because "he knew [Peoples] was handling [her] mother's affairs for her." (Peoples Dep., at 74-76.) Despite plaintiffs' attempt to create one, then, there is no genuine, material dispute of fact as to this issue.

to which Peoples replied that Glover was deceased.  (*Id.*)  Peoples testified that Strine then asked whether Glover had a will, to which Peoples responded affirmatively but stated that it was not probated.  (*Id.*)  Peoples maintains that Strine then stated that "she can force us to sell the house through the probate office," eliciting a response from Peoples that Strine should do what she had to do.  (*Id.*)[5]  Peoples never received any other telephone calls from Phillips & Cohen, nor did she ever personally receive any correspondence from defendant.  (*Id.* at 63.)  By Peoples' own admission, then, that one call commenced and concluded her direct dealings with defendant.

Some time later, Sparks' office received in the mail a document from Phillips & Cohen captioned "Statement and Proof of Claim" and relating to the Glover matter. (Plaintiffs' Exh. 1A.)  This document was addressed to "Estate of Daisy D Glover, Kyra L. Sparks, Atty," implying that Sparks was representing or otherwise involved with Glover's estate.  (*Id.*)[6]  The Statement and Proof of Claim referenced the three delinquent accounts, with a total amount owed of $7,593.47.  (*Id.*)  In the ordinary course of her clerical duties for Sparks, Glover opened the Statement and Proof of Claim concerning the Glover debts.  (Peoples Dep., at 64.)  Upon opening the envelope, Peoples "was embarrassed ... [b]ecause they had [Sparks] down as the attorney handling the estate case."  (*Id.*)  Despite her embarrassment, Peoples gave the document to Sparks.  (*Id.* at 65.)  Sparks' reaction was to exclaim, "I don't do probate work; what is this?" (Sparks Dep., at 61.)  She proceeded to draft a letter (which Peoples typed and mailed) to Phillips & Cohen dated December 15, 2006 verifying her receipt of the Statement and Proof of Claim in the Glover matter, but expressly stating, "I am not the attorney handling this matter and

---

[5]       Strine's notes reflect no such statement, but they do state that Peoples told her in that conversation that Sparks was the attorney of record for Glover's estate, and that Strine should mail a copy of the claim to that office.  (Strine Dep., at 36-37, 39.)  For her part, Peoples denies having made those statements.  (Peoples Aff., ¶ 5.)  For summary judgment purposes, Peoples' version of the facts on this point will be credited.  However, the circumstances surrounding the mailing of the claim are of no more than ancillary importance to plaintiffs' causes of action.

[6]       Phillips & Cohen instructs its personnel that, after being notified that an attorney represents an estate or party, contact is only to be made with the attorney unless, after a reasonable period of time, the attorney fails to return calls, at which time the allegedly represented party may be contacted directly.  (Obringer Dep., at 67.)

I have no knowledge of this case." (Plaintiffs' Exh. 1B; Peoples Dep., at 66.)[7]  Sparks' office received no further documents or correspondence from Phillips & Cohen concerning the Glover matter.  (Peoples Dep., at 69.)

Several weeks later, on or about January 24, 2007, Sparks' then 15-year old daughter, plaintiff Ashley Sparks ("Ashley"), came into contact with Phillips & Cohen concerning the Glover debt.  That afternoon, Strine called Sparks' unpublished home telephone number.[8] Ashley, who resided with her mother, answered.  (A. Sparks Dep., at 14.)  The caller never identified herself.  (A. Sparks Aff., ¶ 3.)  Instead, the caller, who was later identified as Strine, immediately began talking about the Glover estate.  Ashley described these events as follows:  "I couldn't get a word in edgewise to tell her, you need to talk to my mom. ... Any ways, after a little bit she stopped, I said you need to call my mom's office, it's 872-5896."  (A. Sparks Dep., at 14.)  But Strine pressed onward, telling Ashley that Peoples must be intercepting Strine's calls.  (*Id.* at 15.)  Then Strine "just kept talking about an estate. ... She started talking down to me, like I was in trouble. ... And my grandmother told me to hang up, and I told her bye and hung up."  (*Id.*)  This was the only contact that Ashley ever had with Phillips & Cohen.  (*Id.* at 28, 37-38.)  Ashley testified that she did not know how long the telephone call lasted, but that she would not dispute defendant's logs timing that call at 96 seconds.  (*Id.* at 31; Defendants' Exh. H.)  Ashley testified that she cried and was "really, really upset" by Strine's call because she "didn't know if something had happened in the office where [Sparks] was in trouble or something."  (*Id.* at 32.)  Ashley also said she had a headache, and went to bed early that day. (*Id.* at 33-34.)

Sparks came home from work shortly after Strine's telephone call, at which time Ashley

---

[7]     Despite being vexed that Phillips & Cohen contacted her regarding an estate manner concerning Peoples' mother, Sparks did not reprimand Peoples because she did not know how defendant had received her name.  (Sparks Dep., at 64.)

[8]     The record is clear that Sparks' home number is unpublished and unlisted. (Sparks Dep., at 26.)  Sparks maintains an unlisted telephone number to prevent her work from intruding on her home life.  (Sparks Dep., at 26; A. Sparks Dep., at 24; Sparks Aff., ¶¶ 2-3.) That said, Sparks did give her home telephone number to Peoples.  (Peoples Dep., at 40; Sparks Dep., at 28.)

rushed to tell her what had happened.  (*Id.* at 33.)  Sparks observed her daughter to be crying, to have a red face, and to be talking quickly.  (Sparks Aff., ¶ 6.)  By her own reckoning, Sparks became "very angry and upset," to the point where she was short of breath and could feel her heart pounding in her head.  (*Id.*, ¶ 7.)  Because Ashley was unable to identify the caller, Sparks dialed *69 to track the call.  (Sparks Dep., at 65.)  Through that mechanism, Sparks reached Phillips & Cohen, but without more specific information they were unable to connect her to the person who had called Sparks' residence.  (*Id.* at 66.)  Less than 10 minutes later, Sparks called Phillips & Cohen a second time thinking that identifying the previous call as relating to an estate matter might help to direct her to the actual caller.  (*Id.* at 66-67.)  This technique was successful, as Sparks was transferred to Strine.  (*Id.* at 70.)  In the ensuing conversation, Sparks demanded to know how Strine had obtained her unpublished home number, but Strine declined to answer. (*Id.* at 71.)  Sparks complained that Ashley was "upset" and "crying," and said that it was "inappropriate" for Strine to have called her residence and discussed the matter with Ashley. (*Id.* at 72.)  In reply, Strine told Sparks that Ashley had pretended to be Sparks.  (*Id.*)[9]  Sparks asked whether Strine had received Sparks' letter confirming her non-involvement in the Glover estate matter, and Strine answered affirmatively.  (*Id.* at 72, 74; Sparks Aff., ¶ 8.)[10]  Strine then cryptically told Sparks, "we've investigated you already."  (Sparks Dep., at 74.)  Shocked, Sparks asked, "for what?" but apparently never got an answer.  Strine then explained, "I'm calling you because you need to know what kind of employee you have working for you," and

_____

[9]       Ashley denies impersonating her mother, but her own account of the incident suggests that Strine may have been laboring under the impression she was talking to Sparks, and not Sparks' daughter, during the initial call.  According to Ashley, the call began with Strine asking, "is this Ms. Sparks' residence."  (A. Sparks Dep., at 28.)  Ashley testified, "[A]fter that I said, yes, it is. Can I help you with anything."  (*Id.*)  So while Ashley may not have been "impersonating" her mother, Ashley's own narrative suggests that it may have been a reasonable mistake for Strine to believe that she was speaking to Kyra Sparks at that moment.  That determination is for the jury.

[10]      Phillips & Cohen attempts to rebut this testimony by presenting evidence that it has no record of ever receiving the December 15 letter.  (Obringer Aff., at 2.)  This effort is for naught.  As defendant knows, the Court must credit plaintiffs' evidence for Rule 56 purposes, including specifically Sparks' contention that defendant's agent admitted receipt and knowledge of the December 15 letter.

-6-

accused Peoples of intercepting defendant's calls intended for Sparks.  (*Id.* at 72.)  Strine specifically advised Sparks that defendant was "owed money under Daisy Glover's estate."  (*Id.*)  Throughout the call, Strine was "very obnoxious and rude" towards Sparks.  (*Id.* at 74.)

The next day, January 25, 2007, Sparks placed a call to Strine's supervisor to complain about Strine's "wrong and very inappropriate" conduct.  (*Id.*)  Phillips & Cohen assured Sparks that she would receive no further calls concerning the Glover matter.  (*Id.* at 75.)  To the best of her knowledge, Sparks received no more communications from Phillips & Cohen after that.  (*Id.*)  In fact, between November 30, 2006 and January 30, 2007, Sparks had no other contact with Phillips & Cohen of any form.  (Sparks Aff., ¶ 5.)  In none of Sparks' dealings with Phillips & Cohen did they utilize foul language, call her any names, or threaten her.  (Sparks Dep., at 84.)  As an attorney, Sparks was generally aware that Phillips & Cohen could not do anything to her or her daughter.  (*Id.*)

That was the end of the matter, or at least it would have been, but for this lawsuit.  On July 5, 2007, Sparks, Peoples and Ashley filed a Complaint (doc. 1) against Phillips & Cohen in this District Court based on the foregoing events.  The Complaint clearly identified each of Sparks, Peoples and Ashley as plaintiffs in the case, and specified that Ashley was a minor who was proceeding by and through her next friend.  (Doc. 1, ¶¶ 4-6.)  The Complaint alleged the following causes of action: (1) violation of the federal Fair Debt Collection Practices Act ("FDCPA"), including specifically 15 U.S.C. §§ 1692d, e, f, and/or g; (2) a state-law claim for invasion of privacy; (3) a state-law claim for intentional infliction of emotional distress; and (4) a state-law claim for negligent supervision/training.  At the close of discovery, Phillips & Cohen moved for summary judgment on all claims by all plaintiffs.

## II.    Summary Judgment Standard.

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law."   Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing

on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

### III.    Analysis.

As mentioned, the Complaint asserts causes of action against defendant for violation of the FDCPA, invasion of privacy, intentional infliction of emotional distress, and negligent supervision. The parties' summary judgment arguments with respect to each of those claims will be considered in turn.[11]

---

[11]        In addition to the claim-specific arguments, Phillips & Cohen proffers a pair of general contentions that it contends defeat all or most of plaintiffs' claims. First, defendant asserts that plaintiffs are estopped from rebutting defendant's evidentiary submission because plaintiffs did not respond to Defendant's Requests for Admissions within the timeframe specified by Rule 36(a), Fed.R.Civ.P., but instead provided unsigned responses that would have been timely had they been signed. In particular, defendant points to requests asking plaintiffs to admit that they have no evidence to support their allegations of violations of the FDCPA or the state-law claims. (Defendant's Exh. N.) This argument is negated by Magistrate Judge Cassady's Order (doc. 38) entered on May 7, 2008, wherein he authorized plaintiffs to withdraw their deemed admissions and to amend their admissions to the extent that they had done so in their untimely signed responses. Judge Cassady correctly rejected as "patently unfair" defendant's attempt to rid itself of all liability by what amounts to, at most, an instance of excusable neglect by plaintiffs' counsel, particularly when defendant received unsigned responses within the period prescribed by Rule 36 and received signed responses a scant four days after the deadline. As a result, there are no longer any deemed admissions in this case that would entitle defendant to judgment as a matter of law. Second, defendant asserts that Sparks' and Peoples' claims should be summarily dismissed because the Complaint reflects that these plaintiffs are participating in this action solely in their capacity as Ashley's "next friend," such that they cannot be pursuing individual claims. Such a distorted interpretation of the Complaint is inconsistent with any reasonable reading of that document, which plainly identifies Sparks and Peoples as distinct plaintiffs. Moreover, defendant has consistently conducted itself throughout these proceedings on the understanding that there were three individual plaintiffs asserting

A.    **The FDCPA Claim.**

In the Complaint, plaintiffs purport to be resting their FDCPA claims on four distinct sections of that statute, including § 1692d (harassing, oppressive or abusive conduct), § 1692e (false or misleading representations), § 1692f (unfair practices), and § 1692g (validation of debts).  Each of these claims will be considered separately.[12]

The law in this Circuit is clear that the appropriate standard for determining whether § 1692e of the FDCPA has been violated is whether the "least sophisticated consumer" (rather than a reasonable consumer) would have been deceived or misled by the conduct at issue.  *Jeter v. Credit Bureau, Inc.*, 760 F.2d 1168, 1172-75 (11th Cir. 1985).[13]  *Jeter* imposed a similar standard in the § 1692d context, holding that claims under that section "should be viewed from

---

individual claims.  As such, defendant cannot now reasonably purport to have been confused or misled by the Complaint into thinking that Sparks and Peoples were not advancing individual claims herein, but were instead acting solely as Ashley's "next friend."  Defendant's current position is particularly far-fetched with respect to Peoples, who defendant well knows has no familial or legal connection to Ashley whatsoever, but is simply a secretary employed at Ashley's mother's place of business.   Such an argument serves only to confuse the issues and to squander judicial resources.

[12]     Defendant argues that it should be granted summary judgment on the FDCPA causes of action because "based on her collection experience and knowledge of the FDCPA and collection regulations, Ms. Strine testified the collection efforts in the instant matter did not violate the FDCPA or Alabama law."  (Doc. 30, at 18.)  Defendant appears to be characterizing Strine as an expert witness.  (*Id.* at 18 n.6.)  Whatever expertise Strine may have in federal and state law concerning debt collection practices, her self-serving, conclusory opinion that she did not violate the FDCPA is unhelpful at the summary judgment stage.  Besides, the subject testimony was predicated exclusively on Strine's review of her notes, since she testified that she had no independent recollection of the underlying events. (Strine Dep., at 56.)  The record in the light most favorable to plaintiffs contains many pertinent facts that are not memorialized in Strine's notes.  Of course, those facts must be accepted for summary judgment purposes, yet Strine's opinion takes none of them into account.

[13]     *See also Jacobson v. Healthcare Financial Services, Inc.*, 516 F.3d 85, 90 (2nd Cir. 2008) (explaining that question of whether a communication complies with the FDCPA is decided from perspective of "least sophisticated consumer"); *United States v. National Financial Services, Inc.*, 98 F.3d 131, 136 (4th Cir. 1996) ("The basic purpose of the least-sophisticated-consumer standard is to ensure that the FDCPA protects all consumers, the gullible as well as the shrewd.") (citation omitted); *Sanchez v. Client Services, Inc.*, 520 F. Supp.2d 1149, 1156 (N.D. Cal. 2007) (applying "least sophisticated debtor" standard to plaintiffs' FDCPA claims).

the perspective of a consumer whose circumstances make[] him relatively more susceptible to harassment, oppression, or abuse." *Jeter*, 760 F.2d at 1179. The Court will apply this "least sophisticated consumer" standard in evaluating the viability of plaintiffs' FDCPA claims.[14] Additionally, it is important to bear in mind that "[t]he FDCPA is a strict liability statute," and that a single violation is sufficient to establish civil liability. *In re Cambron*, 379 B.R. 371, 374 (M.D. Ala. 2007); *see also O'Connor v. Check Rite, Ltd.*, 973 F. Supp. 1010, 1020 (D. Colo. 1997).

---

[14]     This "least sophisticated consumer" standard is fatal to defendant's near-frivolous assertion that the FDCPA somehow exempts Sparks because she is a lawyer and therefore a sophisticated party. According to defendant, Sparks' status as an attorney precludes her from being an "unsophisticated consumer" that the Act was designed to protect, so she cannot bring a claim. (Doc. 30, at 22.) Under the standard articulated in *Jeter* and the like, however, a plaintiff's actual degree of sophistication is not relevant. *See, e.g., Guerrero v. RJM Acquisitions LLC*, 499 F.3d 926, 934 (9th Cir. 2007) ("If the least sophisticated debtor would likely be misled by a communication from a debt collector, the debt collector has violated the Act.") (citation omitted); *see also David v. FMS Services*, 475 F. Supp.2d 447, 449 (S.D.N.Y. 2007) (characterizing "least sophisticated consumer" test as an objective standard). Any superficial appeal that defendant's argument might have is extinguished by the observation that "sections 1692d, e, or f ... do not designate any class of persons, such as lawyers, who can be abused, misled, etc., by debt collectors with impunity." *Evory v. RJM Acquisitions Funding L.L.C.*, 505 F.3d 769, 773 (7th Cir. 2007). Defendant might (or might not) have a valid argument if Sparks were acting in the capacity of a consumer's attorney in this case, but here she was not. The mere fortuity that Sparks is a lawyer does not strip her of the protections of the FDCPA in her private life, and defendant's argument to the contrary is meritless. *See generally Guerrero*, 499 F.3d at 936 n.4 ("A debt collector is not insulated from liability under the Act merely because a debtor also happens to be an attorney."). And defendant's back-up argument that Sparks is not a "consumer" for FDCPA purposes is equally devoid of merit. Sections 1692d, 1692e, and 1692f speak in terms of unfair debt collection practices directed at "any person," not just a consumer. Section 1692k creates a private right of action where "any debt collector ... fails to comply with any provision of this subchapter with respect ***to any person***." 15 U.S.C. § 1692k (emphasis added). This Court must assume that Congress's word choice was intentional, and that it meant what it said. Thus, whether or not Sparks is a "consumer" is irrelevant to her right to maintain a cause of action against Phillips & Cohen under these sections of the FDCPA. *See, e.g., Beck v. Maximus, Inc.*, 457 F.3d 291, 294 (3rd Cir. 2006) (FDCPA "is intended to protect both debtors and non-debtors from misleading and abusive debt-collection practices"); *Cole v. Toll*, 2007 WL 4105382, *7 (E.D. Pa. Nov. 16, 2007) ("The right to bring a cause of action to enforce the FDCPA is not limited to 'consumers' as that term is defined."); *Eley v. Evans*, 476 F. Supp.2d 531, 533 (E.D. Va. 2007) (construing FDCPA as meaning that "any aggrieved party may bring an action" under §§ 1692e or 1692f, even if that aggrieved party is not a debtor).

### 1.    Did Defendant Act in Connection with Collection of a Debt?

Before reaching the specific statutory sections at issue, the Court must address defendant's threshold challenge to Sparks' and Ashley's FDCPA claims, namely, that Strine's communications with them were not made in connection with the collection of a debt.  All of the statutory sections in play in this case forbid debt collectors from engaging in certain conduct "in connection with the collection of a debt."  15 U.S.C. §§ 1692d, 1692e, 1692f.  Thus, Phillips & Cohen's conduct at issue in this case could not violate the FDCPA unless it occurred in connection with the collection of a debt.

Defendant's position is that neither Strine's telephone call to Ashley nor her communication with Sparks were "in connection with the collection of a debt."  In that regard, defendant points to Ashley's testimony that Strine mentioned an estate, without saying anything about the collection of a debt owed by the estate.  Defendant also relies on Sparks' testimony that when Sparks called defendant's offices to complain, Strine told her that she had called Sparks' residence to inform her that Peoples had been intercepting her calls at the office.

In the undersigned's view, a reasonable jury could readily find that Strine's contacts with these plaintiffs were in connection with the collection of a debt.  Defendant's argument conveniently ignores Sparks' testimony that Strine told her "they were owed money under Daisy Glover's estate."  More generally, and regardless of plaintiffs' testimony, the fact of the matter is that Phillips & Cohen was retained by its clients to collect a debt owed by Glover's estate.  Phillips & Cohen assigned Strine to this project for the purpose of having her collect a debt.  The *raison d'etre* of Strine's communications with plaintiffs was to secure payment of Glover's debts owed to defendant's clients.  Defendant suggests that Strine told Sparks she had called Sparks' home to tell her that Peoples was intercepting her calls.  But accepting that testimony as true, why would Strine have wanted to tell Sparks that?  Because Strine had some altruistic interest in advising Sparks how she might operate her law office in a more efficient and orderly fashion?  Highly improbable.  Because Strine had some personal axe to grind with Peoples, unrelated to the collection of the Glover debt?  Possibly, but not likely.  Applying reason and common sense to draw reasonable inferences from this evidence, a jury could infer that Strine badmouthed Peoples to her boss and harassed her boss at home as a means of applying pressure on Peoples to "play ball" with Phillips & Cohen and pay off her mother's debts.  If Peoples wanted Phillips &

Cohen to leave her alone, a reasonable jury could find, Strine's message conveyed through her call to the Sparks home was that she'd best pay the Glover debt. Again, the whole purpose of Strine's interactions with plaintiffs was to collect that debt. *See Piper v. Portnoff Law Associates, Ltd.*, 396 F.3d 227, 233 (3rd Cir. 2005) (conduct deemed in connection with collection of debt where "the whole purpose of these communications was to secure the payment of money in satisfaction of this debt").[15]

In this regard, the Court finds *Horkey v. J.V.D.B. & Associates, Inc.*, 333 F.3d 769 (7th Cir. 2003), to be instructive. In *Horkey*, a debt collector called the plaintiff at work and demanded payment of a debt. When the plaintiff told the debt collector she could not talk to him at work and hung up on him, the debt collector called back and spoke to the plaintiff's co-worker, who stated that the plaintiff was away from the office. When the co-worker asked if the debt collector wished to leave a message, the latter responded that the co-worker should tell the plaintiff "to quit being such a [expletive] bitch." The *Horkey* court deemed it "obvious" that the message from the debt collector was made "in connection with the collection of a debt" because the collector's sole purpose in calling that number was to collect a debt, and so held as a matter of law. *See id.* at 774. Much as the *Horkey* debt collector's act of cursing the plaintiff to her co-worker was in connection with collecting a debt, so too could a reasonable jury find that Phillips & Cohen's communications with Sparks and Ashley were in connection with collecting the Glover debt.[16] Defendant's request for summary judgment on this basis is **denied**.

---

[15] Implicit in defendant's position is that Strine's failure to utter certain key words or catch phrases in speaking with Sparks and Ashley renders those communications insufficient to meet this threshold requirement. The Court is aware of no case law, and defendant cites none, standing for the proposition that there can be no FDCPA liability if a defendant fails to mention the talismanic phrase "collection of a debt," or if it does not specifically state that the purpose of its call is to collect a debt. The FDCPA cannot reasonably be read so narrowly.

[16] Unlike in *Horkey*, however, the Court does not definitively conclude that Strine's communications with Sparks and Ashley were in connection with the collection of a debt, as a matter of law. A reasonable jury could ascribe other purposes to those communications (*i.e.*, personal animus harbored by Strine against Peoples, an attempt by Strine to deflect Sparks' angry accusations in a call that Strine did not even initiate, etc.). On the specific facts presented here, a jury question is presented as to whether these communications were or were not "in connection with the collection of a debt," as opposed to some other purpose unrelated to debt

-12-

2.      *The § 1692d Claim.*

Under § 1692d, "[a] debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt."  15 U.S.C. § 1692d.  Importantly, this section "does not preclude debt collectors from making non-abusive statements designed to encourage voluntary payment." *Beattie v. D.M. Collections, Inc.*, 754 F. Supp. 383, 394 (D. Del. 1991).  Thus, the critical question for purposes of plaintiffs' § 1692d claim is whether defendant's conduct was harassing, oppressive or abusive.  "Ordinarily, whether conduct harasses, oppresses, or abuses will be a question for the jury."  *Jeter*, 760 F.2d at 1179.  But there are limits to that principle.  In *Jeter*, the appellate court affirmed the district court's grant of summary judgment for the debt collector on the § 1692d claim where the defendant's challenged conduct consisted merely of a threat to institute legal proceedings against the plaintiff, and the caution that such proceedings might cause her embarrassment, inconvenience and expense.  *See also Harvey v. Great Seneca Financial Corp.*, 453 F.3d 324, 330 (6th Cir. 2006) (recognizing that courts have dismissed § 1692d claims as a matter of law if the facts as alleged do not have natural consequence of harassing or abusing a person in connection with the collection of a debt).

Each plaintiff purports to be stating a claim under § 1692d.  Sparks does not invoke any particular subsection of this provision,[17] but maintains that defendant harassed, oppressed or abused her because she came home to a "distraught" daughter on January 24, 2007 and, after she called defendant to complain, Strine did not apologize, but made statements that Ashley had purported to be her mother, that defendant had investigated Sparks, that Peoples was screening calls at Sparks' office, and that Sparks needed to know what kind of employee Peoples was. (Doc. 37, at 16.)  Meanwhile, Ashley's § 1692d claim is predicated specifically on § 1692d(6), which makes it a FDCPA violation for a debt collector to place "telephone calls without

_____

collection.  Both sides will be permitted to argue this point at trial.

[17]      Nor is she required to do so in order to sustain a § 1692d cause of action.  *See* 15 U.S.C. § 1692d (enumerating six specific forms of conduct that violate the section, but stating that such a listing does not limit the general prohibition on harassing, oppressive, or abusive conduct); *Jeter*, 760 F.2d at 1178 (opining that "§ 1692d is explicitly not limited to the conduct proscribed by subsections (1)-(6)").

meaningful disclosure of the caller's identity."  15 U.S.C. § 1692d(6).  Ashley contends that Strine did not identify herself when she called Sparks' residence on January 24, 2007.  And Peoples' § 1692d claim rests on the theory that all of Strine's acts were "a systematic campaign aimed specifically at" Peoples and that "the Defendant was harassing or abusing Peoples by attempting to put indirect pressure on her through her boss (Sparks)."  (Doc. 37, at 19-20.)[18]

With respect to Sparks' § 1692d claim, defendant argues that the mere fact that Strine may have been "rude and obnoxious" to Sparks does not satisfy this section's harassing, oppressive or abusive standard, as a matter of law.  But Sparks' claim, and the facts supporting it, goes much further than that.  Viewed in the light most favorable to plaintiffs, the record shows that Strine had direct personal knowledge that Sparks had no involvement with the Glover estate, yet Strine called Sparks at home anyway to discuss the matter.  Moreover, when Sparks called Phillips & Cohen to complain about its shabby treatment of her minor child, she was met with a barrage of hostility from Strine, including accusations that Ashley had impersonated Sparks, accusations that Sparks' employee (Peoples) was diverting phone messages, and a cryptic statement (a veiled threat?) that Phillips & Cohen had already investigated Sparks.  This testimony, if believed by the jury, could reasonably support a conclusion that the natural consequence of defendant's communications with Sparks, when viewed through the eyes of the least sophisticated consumer, would have been to harass, oppress or abuse that person in connection with the collection of a debt.  Again, plaintiffs' theory is that Strine hounded Sparks as a means of applying pressure on Peoples to pay up.  A reasonable jury could so conclude.

As noted *supra*, Ashley's § 1692d claim proceeds under subsection (6)'s prohibition on the placement of telephone calls by a debt collector in connection with the collection of a debt

---

[18]    In analyzing the § 1692d claims, plaintiffs urge the Court to consider the subjective circumstances of Sparks and Ashley in determining whether defendant's conduct was harassing, offensive, or abusive.  Plaintiffs ask the Court to view Sparks' claims from the perspective of a mother trying to protect her child, and Ashley's claims from the perspective of a 15-year old child.  (Plaintiffs' Brief, at 17-18.)  However, plaintiffs misapply *Jeter*, which plainly imposes an objective standard for determining whether the harassing, oppressive, and abusive criteria are satisfied.  *See* note 14, *supra*.  The Court therefore rejects plaintiffs' suggestion that the standard by which defendant's communications are evaluated is tailored to each plaintiff's individual-specific traits and circumstances, and will instead apply the "least sophisticated consumer" test in assessing these claims.

-14-

without meaningful disclosure of the caller's identity.  Pursuant to the plain language of §
1692d(6), a debt collector's failure to identify herself as such in communications relating to the
collection of a debt has been held to be a *per se* violation of the FDCPA.  *See Masciarelli v.
Richard J. Boudreau & Associates, LLC*, 529 F. Supp.2d 183, 185 (D. Mass. 2007) (defendant's
failure to identify himself as a debt collector in voice-mail message to debtor violates the
FDCPA as a matter of law).  Ashley has unequivocally averred that, with reference to the
January 24, 2007 call, "[t]he female never identified herself."  (A. Sparks Aff., ¶ 3.)  This
testimony, if believed by a jury, would establish a violation of § 1692d(6).  Defendant's Rule 56
Motion is therefore **denied** as to this claim.[19]

With respect to Peoples, there is clearly sufficient record evidence from which a
reasonable finder of fact could determine that defendant's conduct toward her would have been
perceived as harassing, oppressive or abusive by the least sophisticated consumer.  While merely
contacting Peoples about Glover's debts does not implicate § 1692d, Strine's statement to
Peoples that defendant "can force [Glover's family] to sell the house through the probate office"
appeared calculated to prey on any emotional attachment Peoples might have to her mother's
house.  Further, Strine's subsequent conduct of calling Peoples' employer at home for the stated
purpose of telling her "what type of employee [Sparks had] working for [her]," and specifically
complaining to Sparks that Peoples was intercepting her calls could unquestionably be viewed as
having a natural tendency to harass, oppress or abuse Peoples by trying to pressure her into
paying the Glover debt.[20]  Summary judgment is unwarranted as to this claim.[21]

---

[19]      In attempting to evade liability under § 1692d(6), defendant makes a strained
argument that, given Ashley's third party status vis a vis the debt, for Strine to have provided
"meaningful disclosure" would have been to expose Phillips & Cohen to liability under § 1692c.
This contention is disingenuous to the point of frivolity.  Section 1692d(6) does not require a
debt collector to furnish to a third party the details of the debt being collected.  What it does
require, and what Strine is accused of <u>not</u> doing here, is that the debt collector in
communications with any person in connection with the collection of a debt must provide
"meaningful disclosure of the caller's identity."  § 1692d(6).  It is Strine's failure to tell Ashley
who she was, not her failure to disclose specific details of the Glover debt, that forms the basis
for liability under that section.

[20]      In a footnote, defendant protests that there is no evidence that Strine ever said to
Peoples that Peoples was responsible for the debt, was required to remit payment on the debt, or

3.     *The § 1692e Claim.*

Plaintiffs also seek to travel under § 1692e, which proscribes debt collectors from the use of "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. The gist of § 1692e is that "where some aspect of a debt collector's communication - whether explicit or implied - has the purpose or effect of making a debtor more likely to respond, the FDCPA requires that it be true." *Campuzano-Burgos v. Midland Credit Management*, 497 F. Supp.2d 660, 665 (E.D. Pa. 2007). For purposes of a §

_____

the like. (Doc. 39, at 12 n.14.) Thus, defendant simply rehashes its previous failed argument that plaintiffs have not shown that the conduct in question was "in connection with the collection of a debt," as required for FDCPA liability to attach. This argument is rejected for the reasons stated previously.

[21]     Defendant's arguments to the contrary are unavailing. First, defendant contends that the statement to Peoples about its ability to force the family to sell Glover's house was true and correct as a matter of Alabama law. But § 1692d liability does not hinge on the falsity of a statement. Even true statements may be harassing or abusive. Besides, it was Strine's communications as a whole (and not her one phone conversation with Peoples) that gives rise to defendant's possible § 1692d liability. Second, defendant asserts that Peoples' attempt to predicate § 1692d liability on communications directed to Sparks and Ashley is improper under the FDCPA. In support of this proposition, defendant cites a 1999 unpublished district court opinion from Illinois. There is ample precedent to the contrary. *See, e.g., Sayyed v. Wolpoff & Abramson*, 485 F.3d 226, 232 (4th Cir. 2007) (noting that FDCPA defines communication as conveying information regarding a debt directly or indirectly to any person, such that communication to debtor's counsel "plainly qualifies as an indirect communication to the debtor"); *Horkey*, 333 F.3d at 774 n.1 (suggesting, without deciding, that communication routed through intermediary rather than being spoken directly to consumer can support § 1692d claim for consumer, inasmuch as it is "worse" for a third person to receive and relay the message to the debtor than for the debt collector simply to leave a voice-mail message, which itself would be actionable). This view is bolstered by the plain language of the statute itself. For example, § 1692d prohibits a debt collector from engaging "in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." *Id.* Nothing in the statute says the communication must be specifically directed at the person aggrieved. If the natural consequence of a debt collector's statements to person A is that person B would be harassed, oppressed or abused, then person B has a FDCPA right of action against the debt collector. The statute cannot reasonably be read otherwise, nor should it be. After all, a debt collector cannot circumvent liability by accomplishing indirectly that which it cannot do directly. Therefore, Phillips & Cohen cannot take refuge in the fact that some of Strine's allegedly harassing, oppressive and abusive conduct aimed at forcing Peoples to pay the Glover debt actually took the form of communications with Peoples' boss and boss's daughter.

-16-

1692e claim, "[t]he question is not whether [plaintiff] was deceived, but whether the 'least sophisticated consumer' would have been deceived." *Jeter*, 760 F.2d at 1177 n.11. "A debt collection practice may violate the FDCPA even if it does not fall within any of the enumerated circumstances set forth in Section 1692e." *Larsen v. JBC Legal Group, P.C.*, 533 F. Supp.2d 290, 299 (E.D.N.Y. 2008). Plaintiffs contend that defendant violated § 1692e in three specific respects.

First, Sparks asserts a claim under § 1692e(10), which enumerates as conduct violative of this section "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt." Under § 1692e(10), "mere deception, intentional or unintentional, to collect or attempt to collect any debt ... is sufficient to constitute a violation." *Cambron*, 379 B.R. at 379 (citation omitted). Sparks contends that defendant violated § 1692e(10) when Strine told her that "we've investigated you already," that Ashley "pretended to be" Sparks, and that Peoples was screening defendant's calls. (Plaintiffs' Brief, at 15-16.)[22] Clearly, there are jury questions as to the veracity of these statements. Defendant's sole basis for seeking summary judgment on this claim is that plaintiffs have no evidence that Strine's allegedly false representations to Sparks were made in connection with the collection of a debt. The Court having already found to the contrary in Section III.A.1., *supra*, there is no need to re-plow this ground here. Defendant's Motions for Summary Judgment are **denied** as to Sparks' FDCPA claims under § 1692e(10).

Second, Peoples brings a claim under § 1692e(10) and § 1692e(2),[23] predicated on Strine's alleged statement to her concerning the potential sale of Glover's home to pay the debt. Plaintiffs' brief frames the evidence as being that Strine told Peoples, "we are going to sell your mother's home to pay the debt," which plaintiffs contend is a false representation of the status of the debt, and a threat on which defendant never actually intended to act. (Doc. 37, at 21-22.)

---

[22]     In a heading in their brief, plaintiffs refer to "Kyra Sparks, Ashley Sparks, and Madora Peoples' § 1692e(10) Claim," but the body of that section is confined to claims of Sparks. (Doc. 37, at 15-16.) This Court cannot guess at what plaintiffs' theory might be, or fill in the gaps for plaintiffs; therefore, the Rule 56 motion is evaluated on the basis of arguments the parties have actually articulated, rather than hypothetical contentions that remained unspoken.

[23]     That section forbids debt collectors from making false representations as to "the character, amount, or legal status of any debt." 15 U.S.C. § 1692e(2)(A).

The problem is that plaintiffs exaggerate and misstate Peoples' testimony.  In her deposition, Peoples described the conversation as follows: "She said she can force us to sell the house through the probate office.  I told her to do what she had to do."  (Peoples Dep., at 56.)  There is a considerable, material difference between a statement that "we are going to sell your mother's house" and a statement that "she can force us to sell the house."  The former may well qualify as a deceptive or false threat actionable under § 1692e(2) and (10).  The latter does not.  Defendant points out that Ala. Code § 43-2-370 provides that, in general, all of a decedent's property may be sold to pay her debts.  Plaintiffs do not argue that § 43-2-370 does not apply or that defendant lacked the legal right to compel a sale of the house under that section.  Instead, they characterize that statement as a threat or a false representation.  It is neither.

Merely advising the debtor of the agency's options with which to pursue the debt is the sort of truism that is legally insufficient to violate § 1692e.  *See Taylor v. Cavalry Inv., L.L.C.*, 365 F.3d 572, 575 (7th Cir. 2004) (rejecting as frivolous § 1692e claim that statement that account may have interest added was false because no interest was actually added, where the letter said only that interest might be added, not that it would be); *Larsen*, 533 F. Supp.2d at 302; *Riveria v. MAB Collections, Inc.*, 682 F. Supp. 174 (W.D.N.Y. 1988) (no violation of § 1692e(5) where debt collector told plaintiff that it would "advise" creditor that "legal action may be necessary in order to collect"); *Blackwell v. Professional Business Services of Georgia, Inc.*, 526 F. Supp. 535, 537-38 (N.D. Ga. 1981) (debt collector's statement that account "may" be referred to attorney, "may" cause debtor to be liable for additional costs, and "can" lead to garnishment or attachment held not to violate § 1692e, as a matter of law).  Under plaintiffs' version of the facts, Strine never told Peoples that defendant would force a sale of the house, that it intended to do so, or the like.  Instead, Strine merely stated that Phillips & Cohen could force a sale of the house.  That innocuous statement is not violative of § 1692e(2) or § 1692e(10) because it is not false but is a statement of defendant's legal rights under Alabama law.[24]  Entry of summary judgment in defendant's favor is therefore warranted as to Peoples' FDCPA claims under those

---

[24]    Plaintiffs having never challenged, much less rebutted, defendant's representations of its legal rights under Alabama law as to Glover's home, the Court will not endeavor to formulate counterarguments for them.

subsections.

Third, Peoples advances a claim under § 1692e(5), which provides that debt collectors cannot make a "threat to take any action that cannot legally be taken or that is not intended to be taken."  15 U.S.C. § 1692e(5).  Under § 1692e(5), "simply threatening an unintended action is sufficient."  *Cambron*, 379 B.R. at 379.  This claim is not actionable for the same reason that Peoples' claims under § 1692e(2) and (10) are not actionable.  *See generally Gervais v. Riddle & Associates, P.C.*, 479 F. Supp.2d 270, 276 (D. Conn. 2007) (recognizing that analyses under § 1692e(5) & § 1692e(10) are "somewhat duplicative").  Even under the least sophisticated consumer standard, the mere statement by Strine that defendant <u>can</u> compel the sale of the Glover house cannot reasonably be construed as a threat that it will do so, much less a threat that defendant never intended to pursue.  Rather, that statement simply placed Peoples on notice of Phillips & Cohen's options.  Plaintiffs do not dispute that one such option was in fact to pursue the sale of Glover's home; therefore, this statement is not properly characterized as a threat for purposes of § 1692e(5) liability.  Defendant is entitled to summary judgment on Peoples' § 1692e(5) cause of action.

### 4.    The § 1692f Claim.

Plaintiffs further contend that defendant's conduct is actionable under § 1692f, which prohibits the use of "unfair or unconscionable means to collect or attempt to collect any debt."  15 U.S.C. § 1692f.  Although this section enumerates certain specific unfair or unconscionable acts, that listing is illustrative not exhaustive, and "§ 1692f allows the court to sanction improper conduct that the FDCPA fails to address specifically."  *Adams v. Law Offices of Stuckert & Yates*, 926 F. Supp. 521, 528 (E.D. Pa. 1996); *see also McGrady v. Nissan Motor Acceptance Corp.*, 40 F. Supp.2d 1323, 1337 (M.D. Ala. 1998) ("Section 1692f provides a nonexhaustive list of types of conduct which violate § 1692f.").

All three plaintiffs purport to be stating claims under § 1692f that largely rehash their claims under other FDCPA sections.  Peoples argues that defendant's purported threat to sell Glover's house to pay the debt is an unfair or unconscionable practice violative of § 1692f.  (Doc. 37, at 22.)  As stated *supra*, however, the Court finds that the statement that Phillips & Cohen can force the sale of the house would not be perceived by the least sophisticated consumer as a false representation or threat to take action not intended to be taken.  That finding

-19-

likewise compels a conclusion that there was nothing "unfair or unconscionable" (as that term is utilized in § 1692f) about defendant's advice to Peoples of its available remedies under Alabama law.  Inasmuch as Peoples identifies no other grounds for her § 1692f cause of action, that claim is properly **dismissed** at this time.

Sparks and Ashley's § 1692f claims are rooted in their contention that Strine's acts of calling Sparks' home telephone number and berating Ashley "exceed[] the bounds of fairness" and constituted "a means to extract payment from" Peoples.  (Doc. 37, at 23.)  Defendant's only summary judgment argument addressing these claims is a mere conclusory statement that the challenged conduct was not unconscionable "[f]or the reasons cited in the preceding sections." (Doc. 39, at 14.)  But the Court has already rejected Phillips & Cohen's summary judgment arguments "in the preceding sections" relating to the claims against Sparks and Ashley. Defendant having identified no independent basis on which Sparks and Ashley's § 1692f claims do not pass legal muster, this Court will not unilaterally endeavor to promulgate one.  The Motions for Summary Judgment are **denied** as to the § 1692f claims interposed by Sparks and Ashley.

            5.      *The § 1692g Claim.*

In connection with the summary judgment briefing, plaintiffs concede that they are not proper parties to assert a claim under 15 U.S.C. § 1692g. (Plaintiffs' Brief (doc. 37), at 23.) Therefore, defendant's Motions for Summary Judgment are **granted** as to the § 1692g aspect of Count One for all plaintiffs.

            6.      *The Bona Fide Error Defense.*

As a last-ditch effort to defeat plaintiffs' surviving FDCPA causes of action, Phillips & Cohen argues that it is entitled to dismissal of all such claims pursuant to the "bona fide error" defense.  This affirmative defense is codified at 15 U.S.C. § 1692k(c), which provides that a debt collector may not be held liable under the FDCPA "if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error."  *Id.*  As a general rule, "an FDCPA defendant seeking the protection of the bona fide error defense carries the burden of proving that the violation was 1) unintentional, 2) a bona fide error, and 3) made despite the maintenance of procedures reasonably adapted to avoid the error."

*Johnson v. Riddle*, 443 F.3d 723, 727-28 (10th Cir. 2006).  The *Johnson* court explained that "the intent prong of the bona fide error defense is a subjective test" turning on the defendant's subjective intent to violate the FDCPA.  *Id.* at 728.  The "bona fide" requirement "serves to impose an objective standard of reasonableness upon the asserted unintentional violation."  *Id.*

        The Court finds that there are genuine issues of fact as to, at a minimum, the first two prongs of the bona fide error defense.  Phillips & Cohen directs the Court to no evidence or testimony from Strine that she did not intend to violate the FDCPA; to the contrary, they tout her many years of experience and expertise in compliance with that statute.  If that is true, and if plaintiffs' version of the facts is accepted as true, a reasonable jury could find that Strine must have subjectively known that her acts of calling Sparks' home despite knowledge that Sparks was not involved with the Glover matter, refusing to identify herself when calling Sparks' home telephone number, berating Ashley even after Ashley told her to call her mother, casting aspersions on Ashley and Peoples in her communications with Sparks, browbeating Sparks with a statement that defendant had already investigated her, and going out of her way to denigrate and calumniate Peoples to her boss were all outside the scope of permissible activity under the FDCPA.  Even if Strine were not well-versed in the FDCPA, an intent to violate the Act could reasonably be inferred by reference to the numerous inconsistencies between Strine's course of conduct and that prescribed by Phillips & Cohen in its training manuals for collection specialists.  Moreover, on this evidence, a reasonable finder of fact could readily determine that the aforementioned conduct was not objectively reasonable, even if Strine's violations of the FDCPA were unintentional.  In short, there are obvious jury questions presented with respect to the bona fide error defense that render judgment in Phillips & Cohen's favor as a matter of law on that defense inappropriate.[25]

_____

        [25]        In footnotes buried in both its principal and reply briefs, defendant urges the Court to determine whether plaintiffs would be entitled to recovery of attorney's fees and costs at trial in the event that the jury finds a "technical" violation of the FDCPA.  (Doc. 30, at 26 n.14; doc. 39, at 14 n.16.)  This argument is premature.  As there has been no finding of liability against Phillips & Cohen in this case, it would be conjectural and highly inefficient for the Court to render an opinion now as to whether plaintiffs can recover their attorney's fees and costs <u>if</u> they ultimately prevail at trial.  This issue is far more efficiently and appropriately handled via post-trial motion practice, in the event that the contingency of a plaintiffs' verdict materializes at

### B.     The Invasion of Privacy Claim.

Next, Phillips & Cohen moves for summary judgment on the state-law invasion of privacy claims interposed by all three plaintiffs.  Where, as here, there has been no public or commercial use or publication, Alabama courts recognize the tort of invasion of privacy only where "there has been an intrusion upon the plaintiff's physical solitude or seclusion, or a wrongful intrusion into one's private activities in such manner so as to outrage or to cause mental suffering, shame or humiliation to a person of ordinary sensibilities." *I.C.U. Investigations, Inc. v. Jones*, 780 So.2d 685, 689 (Ala. 2000) (citations and internal quotations omitted).  To constitute a "wrongful intrusion," the defendant's conduct must amount to "intentional interference with another's interest in solitude or seclusion, either as to his person or to his private affairs or concerns." *Myrick v. Barron*, 820 So.2d 81, 85 (Ala. 2001) (citation omitted).  Examples would include "physical intrusion into a place where the plaintiff has secluded himself, ... discovering the plaintiff's private affairs through wiretapping or eavesdropping, or ... opening private mail or examining a private bank account." *Id.* at 86 (citation omitted).  Moreover, invasion of privacy is not established under Alabama law unless the wrongdoer's conduct is "such that would cause mental suffering, shame, or humiliation to a person of ordinary sensibilities." *Sphere Drake Ins., P.L.C. v. Shoney's, Inc.*, 923 F. Supp. 1481, 1490 (M.D. Ala. 1996) (quoting *Logan v. Sears, Roebuck & Co.*, 466 So.2d 121, 124 (Ala. 1985)); *see also Butler v. Town of Argo*, 871 So.2d 1, 12 (Ala. 2003) (same).  In the context of debtor-creditor relations, the Alabama Supreme Court has declared that "a creditor has a right to take reasonable action to pursue his debtor and persuade payment, although the steps taken may result to a certain degree in the invasion of the debtor's right to privacy, but that the debtor has a cause of action for injurious conduct on the part of the creditor which exceeds the bounds of reasonableness." *Windsor v. General Motors Acceptance Corp.*, 323 So.2d 350, 351 (Ala. 1975) (citation omitted).

Last year, the Eleventh Circuit explained that "a plaintiff in Alabama must show that the defendant's conduct was so outrageous that it caused the plaintiff mental suffering, shame, or

---

trial; therefore, the Court declines to offer an advisory opinion in the context of this Rule 56 motion.

humiliation (for invasion of privacy) ....” *Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1308 (11th Cir. 2007).  In *Baldwin*, the plaintiff presented evidence that her supervisor had routinely used sexually laced profanity in the office; that he had propositioned her to spend the night in his hotel room; that he often called her “babe”; that on one occasion he closed the door to his office and asked her to perform oral sex on him; that he would walk up behind her and breathe on her neck; and that he unzipped his fly in her presence, all of which the plaintiff found offensive and all of which caused her discomfort.  Notwithstanding this egregious misconduct, the *Baldwin* panel found no genuine issue of material fact as to the Alabama invasion of privacy cause of action.  As that court explained, “[a]ssuming that [the supervisor] did everything that [the plaintiff] said he did, his harassment of [the plaintiff] was not sufficiently outrageous as a matter of Alabama law” to sustain an invasion of privacy claim.  *Id.*

Similarly, in *Windsor*, the creditor contacted the debtor, either in person or by telephone, approximately 15-20 times concerning her delinquent payments.  The creditor spoke to the debtor’s mother (with whom the debtor lived) several times, and would come to the house even after the mother informed the creditor that the plaintiff was not home.  The creditor was condescending to the debtor’s mother, to the point where after he called she “just went crazy,” and on one occasion she even “went to the hospital and stayed there.”  323 So.2d at 352.  The *Windsor* court found no error in the trial court’s granting of a directed verdict in the defendant’s favor as to the mother’s invasion of privacy claim.

The intrusion of which plaintiffs in this case is far milder than that deemed legally insufficient to constitute an invasion of privacy in *Windsor* and *Baldwin*.  Indeed, the sum total of Strine’s interactions with plaintiffs consisted of calling Sparks’ unlisted home telephone number on one occasion, conducting one 96-second telephone conversation with Ashley that made Ashley and Sparks upset, having one heated telephone conversation with Sparks (that Sparks initiated), having a single telephone conversation with Peoples about the Glover estate, mailing a statement of claim form to Sparks’ office, telling Sparks that defendant had investigated her in some unspecified manner,[26] and making accusations to Sparks that Peoples

---

[26]     With regard to the “investigation” comment, plaintiffs have adduced no evidence that Phillips & Cohen actually performed any investigation concerning Sparks.  Not all

-23-

was intercepting phone messages and that Ashley had impersonated her mother.  Such slights may well have been impolite, ill-advised and inappropriate, but they plainly do not rise to the level of an intentional interference with any plaintiff's solitude and seclusion.  Even if they did, and even if plaintiffs are correct that Strine had no valid reason to call Sparks' home telephone number in the first place, the Court finds as a matter of law that Strine's actions were not so outrageous as to cause mental suffering, shame, or humiliation to a person of ordinary sensibilities.

In short, plaintiffs' invasion of privacy claims endeavor to stretch the boundaries of that tort far wider than the Alabama Supreme Court has ever done.  Having an unlisted home number because one does not wish to be bothered by professional matters while at home is not a guarantee that one will never receive an unwanted business-related call at home.  Being 15 years old is not a guarantee that one will never receive an unpleasant or confusing telephone call intended for one's mother.  And being a secretary in a law office is not a guarantee that no member of the public will ever call one's boss to voice even unwarranted criticism of one's job performance.  Such minor irritations and intrusions are, at most, the sort of inconvenience and nuisance with which every participant in modern-day society must deal on a routine basis.  The narrow, circumscribed reach of the tort of invasion of privacy having never been expanded by Alabama courts to embrace such run-of-the-mill slights, this Court will not so dilute it here.  Therefore, Defendant's Motions for Summary Judgment are **granted** as to plaintiffs' state-law claims for invasion of privacy.[27]

---

investigations of attorneys constitute invasions of privacy.  For example, one may investigate an attorney in a matter of seconds by checking the Martindale-Hubbell database to ascertain her education, practice areas, and peer review ratings.  Or one may investigate an attorney by calling the state bar to inquire as to whether any disciplinary proceedings have been initiated as to that attorney.  Plaintiffs could not seriously contend that such an "investigation" would constitute an unlawful invasion of privacy.  Thus, Strine's mere statement to Sparks that "we've already investigated you" cannot support an invasion of privacy claim in the absence of evidence (which plaintiffs have not submitted) that an investigation was actually performed and that such investigation in some way touched or intruded upon Sparks' private affairs or concerns.

[27]     The Alabama Supreme Court's decision in *Jacksonville State Bank v. Barnwell*, 481 So.2d 863 (Ala. 1985) is illustrative of the type of conduct that must be proven in order to prevail on an invasion of privacy theory under Alabama law.  In *Barnwell*, the court affirmed the

### C.    The Intentional Infliction of Emotional Distress Claim.

Plaintiffs have prudently consented to the dismissal of their state-law causes of action for intentional infliction of emotional distress.  (*See* doc. 37, at 40.)  Therefore, defendants' Motions for Summary Judgment are **granted** as to these claims.

### D.    The Negligent Supervision/Training Claim.

Lastly, Phillips & Cohen seeks summary judgment on plaintiffs' claim of negligent supervision and training.  As set forth in the Complaint, plaintiffs' theory on this cause of action is that Phillips & Cohen "had notice or knowledge, either actual or presumed, of their servants' incompetency or unfitness.  Further, the specific acts of incompetency were of such nature, character, and frequency that Defendant in the exercise of due care must have had notice of such action."  (Complaint, ¶ 38.)

Under Alabama law, "[i]n the master and servant relationship, the master is held responsible for his servant's incompetency when notice or knowledge, either actual or presumed, of such unfitness has been brought to him."  *Voyager Ins. Companies v. Whitson*, 867 So.2d 1065, 1073 (Ala. 2003) (citation omitted); *see also Corbitt v. Home Depot USA, Inc.*, 2008 WL 616057, *19 (S.D. Ala. Mar. 3, 2008) (employer may be liable for negligent supervision or training under Alabama law if plaintiff "can show by affirmative proof that the alleged incompetence of the employee was discoverable by the employer if it had exercised care and proper diligence") (citations omitted).  "Liability depends upon its being established by affirmative proof that such incompetency was actually known by the master or that, had he exercised due and proper diligence, he would have learned that which would charge him in the law with such knowledge."  *Armstrong Business Services, Inc. v. AmSouth Bank*, 817 So.2d 665, 682 (Ala. 2001) (citation omitted).  "It is not sufficient merely to allege, or to show, that the employee acted incompetently."  *Id.* at 683.  Thus, a plaintiff bringing a claim of negligent supervision/ training must show that the defendant either had actual knowledge of its employee's

---

trial court's denial of defendant's motion for directed verdict on invasion of privacy claims where the creditor made 28 to 35 telephone calls to the debtor's home and place of employment; utilized coarse, inflammatory, malicious and threatening language; and fraudulently altered terms of a security instrument to collect the debt.  *See id.* at 866.  By comparison, the conduct of which plaintiffs accuse Strine in this case is positively benign.

wrongful acts and did nothing about it, or that it would have known about the employee's wrongful acts had it exercised due and proper diligence. *See Baldwin*, 480 F.3d at 1309.

Plaintiffs' evidence, if believed by a jury, would show that Strine, defendant's employee, engaged in wrongful conduct toward plaintiffs that violated the FDCPA in certain respects. But that is not enough to establish a claim of negligent supervision or training. Plaintiffs argue that Strine engaged in technical violations of Phillips & Cohen's written policies by failing to call the Probate Court of Dallas County, Alabama, to see if Glover had an estate; by failing to document events in her notes sufficiently; and the like. Again, such violations do not automatically give rise to a viable claim of negligent supervision or training. Plaintiffs do not argue (and present no evidence) that Strine was not adequately trained by Phillips & Cohen in its procedures and practices. Plaintiffs do not argue (and present no evidence) that Phillips & Cohen had actual knowledge of Strine's wrongful conduct with respect to the Glover matter, or any previous matters. Instead, it appears that plaintiffs are predicating this claim on the theory that defendant should have known that Strine was acting in a manner that violated the FDCPA because her supervisor sits 10 feet away from her, and "[m]anagement knew there was a good possibility that Strine fabricated notes," but never disciplined her for it. (Doc. 37, at 39-40.)[28] But plaintiffs

---

[28]     Plaintiffs' argument on this point is difficult to follow because it is obscured by pages of irrelevant and/or unhelpful assertions. For example, plaintiffs protest that defendant has not produced certain evidence in discovery, that Strine is not really an FDCPA expert, that defendant's 30(b)(6) deponent lacked familiarity with certain details of company procedures, and that the probate court should have been called. (Doc. 37, at 35-40.) This kind of scattered, stream-of-consciousness argument clouds the issues and hampers the Court's efforts to understand how and why plaintiffs believe they are entitled to reach a jury on a negligent supervision/training theory. If plaintiffs believed that defendant withheld requested discovery, their remedy was not to complain about it in Rule 56 briefing, but to file a timely motion to compel, which they evidently did not do. Whether or not Strine is qualified as an FDCPA expert is irrelevant to whether defendant met its duty of care in training and supervising her. The record does not appear to support plaintiffs' accusation that Phillips & Cohen's 30(b)(6) deponent lacked knowledge of particular collection specialist procedures and, even if it did, that fact does not appear probative of the negligent supervision/training claims. And whether or not the Dallas County Probate Court should or should not have been called is of no consequence because the wrongful acts plaintiffs ascribe to Strine are not her failure to call the court, but are instead her telephone contacts with plaintiffs. *See generally Zielke v. AmSouth Bank, N.A.*, 703 So.2d 354, 360 (Ala.Civ.App. 1996) (trial court correctly excluded defendant's training manual from evidence in negligent training case where plaintiff did not claim that he had suffered harm

have submitted no evidence that Strine's supervisor actually heard her make allegedly FDCPA-violative statements at any time, or that anyone had ever complained to defendant of similar misconduct by Strine.  Plaintiffs cite no evidence to support their conclusory statement that Phillips & Cohen knew or should have known that she was fabricating notes.  Even if they had, the tortious acts plaintiffs ascribe to Strine are not inaccurate statements in her claims notes, but rather harassing, abusive, oppressive, false and unfair statements to them in telephone communications.  That Strine may have recorded those events inaccurately in her notes is not relevant to the negligent supervision/training claim, because plaintiffs cannot credibly allege that they were harmed by any inaccuracies in Strine's notes.

Likewise unavailing is plaintiffs' conclusory statement that "[a] jury could find from the Defendant's Manual that the debt collectors are negligently trained to invade a person's privacy."  (Doc. 37, at 40.)  The Court having already determined as a matter of law that Strine did not commit the Alabama tort of invasion of privacy with respect to plaintiffs, any inadequacies in training in that regard cannot sustain a negligent training cause of action.  *See Voyager*, 867 So.2d at 1073 ("A party alleging negligent or wanton supervision or hiring must also prove the underlying wrongful conduct of employees.").

Simply put, plaintiffs have come forward with no evidence that Phillips & Cohen knew or should have known that Strine was an incompetent employee.  They point to no evidence that defendant was aware or should have been aware that she engaged in harassing or oppressive tactics to collect debts, or that she made false accusations about deceased debtors' family members to their employers to intensify the pressure on the family members to pay up.  The record evidence does not reflect that Strine was a problem employee or habitual offender; to the contrary, her disciplinary record was virtually spotless.  Thus, plaintiffs would have this Court allow them to present a negligent supervision/training theory to the jury even though they have proffered no evidence that Phillips & Cohen knew or had reason to know that Strine was using improper methods to collect debts in estate cases.  This attempt fails, and defendant is entitled to summary judgment.

---

as a result of guidelines in manual that were inconsistent with the law).

**IV.    Conclusion.**

If plaintiffs' evidence is believed by the jury, then Phillips & Cohen employed a rogue collection specialist who sought to bully Peoples into cooperation by making threats, badgering her boss at home, concealing her identity, falsifying accusations about Peoples' work performance, and even intimidating her boss's daughter.  Of course, there's another side to the story.  Defendant's evidence (based largely on Strine's contemporaneous notes, which are business records of defendant) will portray plaintiffs as having fabricated these alleged threats and statements by defendant's employee, perhaps suggesting that Peoples lied to defendant's representatives, then sought to cover up her misconduct through further lies to her employer and others that culminated in this lawsuit.  Defendant's evidence will show that Strine had valid reasons to call Sparks at home based on misleading or false information given her by Peoples.  It will be for the jury to decide who is telling the truth with respect to plaintiffs' FDCPA causes of action.

For all of the foregoing reasons, it is **ordered** that Defendant's Motion for Summary Judgment to Dismiss Plaintiff Ashley Sparks' Claims (doc. 20), Defendant's Motion for Summary Judgment to Dismiss Madora Peoples' Claims (doc. 22), and Defendant's Motion for Summary Judgment to Dismiss Kyra Sparks' Claims (doc. 24) are **granted in part, and denied in part**.  The Motions are **granted** with respect to the following causes of action: (a) plaintiff Peoples' FDCPA claims under 15 U.S.C. §§ 1692e and 1692f; (b) all plaintiffs' FDCPA claims under 15 U.S.C. § 1692g; (c) all plaintiffs' claims for invasion of privacy; (d) all plaintiffs' claims for intentional infliction of emotional distress; and (e) all plaintiffs' claims for negligent training / supervision.  Those enumerated claims are **dismissed with prejudice**.  With respect to all remaining claims, the Motions for Summary Judgment are **denied**.

DONE and ORDERED this 20th day of June, 2008.


s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE